Vijay N. BORASE, Plaintiff,

v.

M/A COM, INC., Defendant.

Civil Action No. 94–10407–MLW.

United States District Court,
D. Massachusetts.

April 9, 1997.

John A. Houlihan, Steven M. Cowley, Edwards & Angell, Boston, MA, for Plaintiff.

David B. Ellis, James W. Bucking, Foley, Hoag & Eliot, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON PLAINTIFF VIJAY BORASE'S MOTION TO COMPEL DEPOSITION TESTIMONY BY J. KERMIT BIRCHFIELD AND JAMES W. SULLIVAN (# 52)*

COLLINGS, United States Magistrate Judge.[1]

## I. Introduction

Plaintiff Vijay Borase seeks to compel the defendant M/A COM to produce two witnesses, J. Kermit Birchfield and James W. Sullivan, to respond to certain questions at deposition as to which they were previously instructed not to answer on the grounds of privilege. At his two prior depositions, Mr. Birchfield, former Senior Vice–President, Corporate Secretary and General Counsel of M/A COM, was instructed by his attorney not to respond to questions regarding conversations that he had with other M/A COM senior managerial employees, specifically James W. Sullivan, the Director of Human Resources, Richard Hale, Mr. Borase's immediate supervisor, Allan Rayfield, President and Chief Operating Officer, Thomas Vanderslice, Chairman of M/A COM's Board of Directors, Robert Glaudel, Senior Vice President of Human Resources, Burt Widener, Vice President and General Manager of the Interconnect Products Division of M/A COM[2] and James Morton, Chairman of M/A COM's Compensation Committee, premised upon an assertion of the attorney-client privilege. During his deposition, Mr. Sullivan was also directed not to answer questions aimed at probing his conversations with Mr. Birchfield.[3]

Mr. Borase contends that during these conversations, Mr. Birchfield was acting as a businessman, not a lawyer, and thus was not entitled to invoke the attorney-client privilege. M/A COM holds the contrary view, arguing that Mr. Birchfield was acting as an attorney and that the subject conversations are clearly protected by the attorney-client privilege.

## II. The Facts

The relevant background facts of this case, for present purposes at least, are not in dispute. The plaintiff was employed by M/A COM from February, 1985 until the time of his discharge on January 20, 1993.[4] When he was terminated, Mr. Borase served as Vice President of M/A COM's Government Sector, having risen through the ranks over the years from the position of Operations Manager to the position of General Manager and ultimately to the highest position in his division. At least through the first seven years of his employment with the defendant, the plaintiff received excellent performance evaluations which resulted in certain awards of stock units and stock options.

Mr. Borase's immediate supervisor, Richard Hale, made the decision to fire the plaintiff after consulting with M/A COM's President and Chief Operating Officer, Allan Rayfield, and thereafter advised the plaintiff of the termination on January 20, 1993. The defendant's articulated reason for discharging Mr. Borase was his purported lack of commitment to the matrix management organization structure which the company was implementing. Disbelieving this explanation, the plaintiff contends that M/A COM in fact fired him on account of his race, color and national origin.

---

1. The within case has been referred to the undersigned United States magistrate judge for all purposes, including trial and entry of judgment, pursuant to 28 U.S.C. § 636(c).

2. The defendant notes that although discussions with Mr. Widener are included in the plaintiff's motion, in fact, Mr. Birchfield ultimately testified about these conversations after the plaintiff agreed that the testimony would not constitute a waiver of the privilege. (# 54 at 12 n. 19)

3. The parties' memoranda focus solely upon Mr. Birchfield's testimony in part, at least, because Mr. Sullivan's deposition apparently had yet to be transcribed at the time that the plaintiff's motion was filed. In any event, the same arguments apply to the attempt to compel further testimony from Mr. Sullivan.

4. The plaintiff takes the position that he remained employed at M/A COM until early June, 1993. This factual discrepancy is not material in the context of the instant motion.

After being informed of his discharge, Mr. Borase spoke with James Sullivan, the Director of Human Services at M/A COM. The two talked about the plaintiff executing a separation agreement providing for severance pay and other benefits, and Mr. Sullivan agreed to provide Mr. Borase with a preliminary version. Mr. Sullivan undertook to draft the agreement, which was then reviewed by Mr. Birchfield before being presented to the plaintiff. Thereafter, negotiations with respect to the proposed agreement ensued. By February 22, 1993, Mr. Borase had retained counsel, the law firm of Edwards & Angell, to represent him in the process, while M/A COM claims to have relied upon Mr. Birchfield, its General Counsel. Attorneys from Edwards & Angell, Gerald Hendrick and John Houlihan, dealt with Mr. Birchfield in the following months, although Mr. Borase and Mr. Sullivan also spoke directly about the separation agreement as well as other issues. During the course of the negotiations and in connection with them, Mr. Birchfield spoke with various members of M/A COM's management personnel.

Pursuant to the terms of M/A COM's Restricted Treasury Stock Plan, Mr. Borase contends that he is entitled to twenty-five thousand shares of stock based upon the stock having reached a trigger price in May of 1993. During the negotiation process, the plaintiff discussed this claim with Mr. Sullivan while attorneys from Edwards & Angell discussed it with Mr. Birchfield. M/A COM's General Counsel discussed Mr. Borase's restricted treasury stock claim with several M/A COM officials. The company's position as articulated by both Mr. Sullivan and Mr. Birchfield was that the plaintiff had no legal right to the shares of stock, either under the terms of the Plan or pursuant to the proposed settlement agreement.

Following January 20, 1993, the plaintiff continued to receive his salary and other benefits from M/A COM, although he did not have to report to the office. In late May of that year Mr. Borase accepted a position with a company named Amphenol Corporation; he began working for Amphenol on June 3, 1993. Approximately six weeks later, Mr. Borase filed a complaint with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission alleging that M/A COM had discriminated against him by discharging him from his employment on the basis of his race, color and national origin.

At some point after the plaintiff began working for Amphenol, M/A COM notified him that it was forfeiting 6,322 shares of stock previously awarded, but not yet paid, to him under the M/A COM Key Employee Stock Unit Plan. According to the defendant's Long–Term Key Contributor Performance Incentive Plan, an employee's outstanding stock units under the Plan are to be forfeited if that employee competes with M/A COM within one year after leaving the company's employ. M/A COM takes the position that Mr. Borase violated the non-competition clause by commencing employment with Amphenol and thus his stock units were subject to forfeiture. The plaintiff asserts that the defendant's purported justification for forfeiting the stock was but a sham and that MA/COM purportedly forfeited the stock on account of Mr. Borase's race, color and national origin as well as to retaliate against him for filing his discrimination claim with the MCAD and the EEOC.

Under the Plan, the Compensation Committee of M/ACOM's Board of Directors is empowered to decide whether a former employee's shares are to be forfeited. In this instance, Robert Glaudel, the company's Vice President of Human Resources, bore the responsibility of gathering information about the relevant circumstances and thereafter making a presentation to the Committee with respect to the forfeiture of Mr. Borase's stock units. Mr. Glaudel garnered the requisite information essentially by speaking with Burt Widener, M/A COM's Vice President and General Manager of Interconnect Products Division, and thereafter recommended to the Compensation Committee that the plaintiff's stock units be forfeited. Mr. Birchfield neither made any presentation to the Compensation Committee nor was he present during Mr. Glaudel's presentations. He did, during this period, speak with James Morton, the Chairman of the Compensation

Committee, with respect to the potential forfeiture of the plaintiff's stock units.

On or about February 28, 1994, Mr. Borase filed the original complaint in this action. As discovery continued apace, in or around November, 1995, plaintiff's counsel advised counsel for the defendant of Mr. Borase's plan to depose Mr. Birchfield, by that time the former Senior Vice President and General Counsel of M/A COM. It was during the two sessions of this deposition taken on January 12 and June 12, 1996, that the attorney-client privilege was interposed regarding Mr. Birchfield's conversations with different M/A COM employees.

This recitation is sufficient to set the stage. Additional facts shall be set forth within the discussion as necessary.

### III. Discussion

There are two points at the outset which can be dispatched with haste. First, the plaintiff claims that the defendant has waived any privilege that may have attached to Mr. Birchfield's conversations with others on the subject of the reasons for Mr. Borase's termination. The basis for this alleged waiver is Mr. Borase's deposition testimony wherein he stated that Mr. Birchfield told him that Mr. Birchfield and Mr. Glaudel met with Mr. Rayfield before Mr. Borase's discharge was announced and tried to persuade Mr. Rayfield that the wrong person was being fired, but that Mr. Rayfield had already decided that he was going to terminate Mr. Borase. According to the plaintiff, the revelation of the content of those conversations to Mr. Borase waived any applicable privilege. *See, e.g., Texaco Puerto Rico v. Department of Consumer Affairs*, 60 F.3d 867, 883–84 (1 Cir.1995).

While the legal principle may be sound, the problem lies in the fact that Mr. Birchfield denies having had such a conversation with Mr. Borase. In the face of this fundamental conflict, it is impossible to find as a matter of fact that any waiver has occurred.

Second, M/A COM argues that Mr. Borase's motion is untimely and should be denied on that ground alone. This point is not well taken given that the defendant, as the party claiming the privilege and refusing to answer the questions, had the burden of moving for a protective order and failed to do so. *See American Hangar, Inc. v. Basic Line, Inc.*, 105 F.R.D. 173, 175 (D.Mass.1985) citing *International Union of Electrical, Radio and Machine Workers, AFL–CIO, et al. v. Westinghouse Electric Corporation*, 91 F.R.D. 277, 280, fn. 4 (D.D.C.1981). In such circumstances, the defendant has no grounds to complain about the timing of the motion to compel.

Turning now to the substantive issue, M/A COM asserts that at all relevant times, Mr. Birchfield served as its General Counsel with the responsibility of heading its legal department and overseeing "the legal affairs of M/A COM" which included numerous national and international operations. Mr. Birchfield was a member of the bar of the state of New York. The defendant contends that the questions which Mr. Birchfield was directed not to answer related to discussions concerning Mr. Borase's discharge from employment, the possibility that Mr. Borase might bring a discrimination charge against the company, the terms and conditions of the proposed separation agreement, the dispute about Mr. Borase's entitlement to the twenty-five thousand shares of restricted treasury stock, and the dispute over the forfeiture of Mr. Borase's stock units. M/A COM takes the position that each of the questions posed is intended to elicit privileged information and that they

> go to the core of the attorney-client privilege: oral communications between M/A COM's attorney and senior officials of the company concerning the reasons behind, and the stock and discrimination disputes arising out of, M/A COM's termination of another senior company official, disputes now at the center of the instant lawsuit.

Defendant's Opposition # 54 at 12.

The essence of M/A COM's argument is that "it is evident from the nature and circumstances of Birchfield's discussions with the various M/A COM officials at issue here that the substance of those discussions is privileged." (# 54 at 19)

14

■ It is undisputed that the party asserting the attorney-client privilege bears the burden of demonstrating its applicability. *See, e.g., Town of Norfolk v. U.S. Army Corps of Engineers,* 968 F.2d 1438, 1457 (1 Cir.1992); *U.S. v. Bay State Ambulance,* 874 F.2d 20, 27-28 (1 Cir.1989); *Winchester Capital Management v. Manufacturers Hanover,* 144 F.R.D. 170, 174 (D.Mass.1992). It is equally true that the privilege applies in the corporate setting, protecting communications between corporate officers and corporate General Counsel. *Upjohn Co. v. United States,* 449 U.S. 383, 389–90, 101 S.Ct. 677, 682–83, 66 L.Ed.2d 584 (1981).

■ It has been emphasized, however, that "[t]he attorney-client privilege attaches only when the attorney acts in that capacity." *Texaco Puerto Rico,* 60 F.3d at 884. It does not apply when in-house counsel is engaged in "nonlegal work." *Burlington Industries v. Exxon Corporation,* 65 F.R.D. 26, 33 (D.Md.1974); *Oil Chemical and Atomic Workers International Union v. American Home Products,* 790 F.Supp. 39, 41 (D.P.R. 1992). Such "nonlegal work" would include the rendering of business or technical advice unrelated to any legal issues. *Pacamor Bearings, Inc. v. Minebea Co., Ltd.,* 918 F.Supp. 491, 510–511 (D.N.H.1996); *Winchester Capital,* 144 F.R.D. at 175. However, "[c]lient communications intended to keep the attorney apprised of business matters may be privileged if they embody 'an implied request for legal advice based thereon.'" *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 404 (8 Cir.1987), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987) quoting from *Jack Winter, Inc. v. Koratron Co.,* 54 F.R.D. 44, 46 (N.D.Cal., 1971).

■ Accordingly, if an in-house counsel has other nonlegal responsibilities, the party invoking the privilege has the burden of producing evidence in support of its contention that in-house counsel was engaged in giving legal advice and not in some other capacity at the time of the disputed conversations. *Jack Winter, Inc.,* 54 F.R.D. at 46. Thus, in the instant case, in order to prevail, M/A COM must prove that Mr. Birchfield was acting as an attorney during the course of these disputed conversations. Merely saying that he was so acting in a memorandum of law is patently insufficient to meet the burden. Neither can it be assumed. *S.E.C. v. Gulf & Western Industries, Inc.,* 518 F.Supp. 675, 683 (D.D.C.1981). As the Court of Appeals for the District of Columbia noted in a case in which the Government, during an investigation of a "Company" for suspected criminal activity, sought grand jury testimony from an individual noted "C":

> We are mindful ... that C was a Company vice president, and had certain responsibilities outside the lawyer's sphere. The Company can shelter C's advice only upon a **clear showing** that C gave it in a professional legal capacity.

*In re Sealed Case,* 737 F.2d 94, 99 (D.C.Cir. 1984) citing *S.E.C. v. Gulf & Western Industries, Inc.,* 518 F.Supp. at 683 (emphasis added).

Or as another court put the rule, the party "asserting the privilege", i.e., "the proponent":

> ... must provide the court with enough information to enable the court to determine privilege, and the proponent must show by affidavit that precise facts exist to support the claim of privilege.

*North Carolina Electric Membership Corporation v. Carolina Power & Light Company,* 110 F.R.D. 511, 515 (M.D.N.C.1986) (citations omitted).

To the same effect are the cases of *International Paper Company v. Fibreboard Corporation,* 63 F.R.D. 88, 94 (D.Del.1974) and three cases which either quote from it or cite to it, i.e., *Coastal Corporation v. Duncan,* 86 F.R.D. 514, 520 (D.Del.1980); *Barr Marine Products Co., Inc. v. Borg–Warner Corp.,* 84 F.R.D. 631, 636 (E.D.Pa.1979) and *North American Mortgage Investors v. First Wisconsin National Bank of Milwaukee,* 69 F.R.D. 9, 12 (E.D.Wis.1975).

The defendant, in a footnote, quotes from a 1956 Yale Law Journal article to the effect that the burden of the party claiming the privilege is satisfied by "... com[ing] forward with only a modicum of evidence as to the fact of the attorney-client relationship and the nature of the disclosure." # 54 at p. 13, footnote 13 quoting Simon, *The Attorney–*

*Client Privilege as Applied to Corporations,* 65 Yale L.J. 953, 976[sic]. The problem is that the author was referring to a situation in which the attorney "... normally acts in a legal capacity ..." even though the attorney "on occasion [has] received or given collateral business advice as an incident of his legal assistance." *Id.* at 977–8. Later in the article, the author spoke of the corporate attorney who acts in the role of an attorney as well as in other business roles, as Mr. Birchfield did in his capacity as Senior Vice–President and Corporate Secretary.

> On the other hand, the burden of going forward with **evidence** would be shifted once it was shown that the attorney had not only been active in the usual kind of legal assistance, but had also been regularly acting as a business adviser in an area that included the transaction at issue. Since the client in such a case has placed the attorney in a dual role where his true colors are hard to perceive, it should be up to the client (or the person urging his privilege) to satisfy the court that a particular communication qualifies for protection and can be effectively segregated from the others.

Simon, *The Attorney–Client Privilege as Applied to Corporations,* 65 Yale L.J. at 978 (emphasis supplied).

The author then notes that for this reason:

> ... [I]t would be unwise but not necessarily fatal, insofar as the privilege is concerned, for an attorney to accept any recognized business position with the client— as director, officer, department head, or the like. Such an attorney would have to

be prepared to segregate his legal activities in a **clearly demonstrable fashion**.

*Id.* at 978 (emphasis added).[5]

█ Having examined all of the pertinent filings with care, there is a notable lack of **evidence** submitted by the defendant in support of its position. For example, there are no affidavits on record from the participants in these discussions confirming that legal advice was being sought or rendered.[6] So far as appears in the record before me, there was no questioning at the depositions by M/A COM's counsel which would demonstrate the applicability of the privilege. At best, M/A COM would have the Court presume this to be the case from the circumstances, arguing that obviously Mr. Birchfield was acting in the same capacity as the attorneys from Edwards & Angell. While such an assumption might be able to be made if M/A COM had retained outside counsel for the particular purpose of representing it in its dealings with Mr. Borase and his attorneys, the assumption cannot be made in the case of an inhouse counsel who has other additional responsibilities over and above the rendering of legal advice. On the record before me, it is not possible to find that Mr. Birchfield was giving legal as opposed to business advice. For example, as the plaintiff notes, Mr. Birchfield testified that he consulted with managers, including Messrs. Glaudel, Rayfield and Vanderslice, concerning employees' performances as against stated performance goals, their entitlement to bonuses, stocks, etc. Thus, when discussing the termination of Mr. Borase or the restricted treasury stock or the stock forfeiture, Mr. Birchfield

---

5. The other authorities cited in the defendant's memorandum in the footnote on page 13 do not alter this analysis. In the *Jack Winter, Inc.* case, the quotation that "doubts have been resolved in favor the privilege" dealt with documents contained "considerable factual information but which were nonetheless primarily concerned with giving legal guidance to the client ...". *Jack Winter, Inc.,* 54 F.R.D. at 46. The doubts being resolved did not concern whether the communication concerned legal as opposed to nonlegal matters. In the case of *Shawmut, Inc. v. American Viscose Corp.,* 12 F.R.D. 488, 489 (D.Mass., 1952), the "... matter [which] is ordinarily privileged ..." to which the court referred is advice counsel gave to the defendant. *Id.* There was no issue as to whether the attorney's

advice was on legal matters. Lastly, in the *Winchester Capital* case, 144 F.R.D. at 174, the court's statement as to being able to presume from the circumstances whether a communication was meant to be confidential is far different from being able to presume that a lawyer who has a dual role in a corporation is giving legal as opposed to nonlegal advice.

6. James W. Sullivan has submitted an affidavit, but its contents go to the facts that M/A COM is a multi-national corporation and that during his tenure as General Counsel, Mr. Birchfield was responsible for all the domestic and foreign operations. *See* Affidavit of James W. Sullivan # 55.

could well have been acting in his ordinary business role.

I rule that M/A COM has failed to carry its burden of demonstrating the Mr. Birchfield was acting as an attorney, rather than a businessman, in the following circumstances:

1. During conversations with Messrs. Rayfield, Hale, Vanderslice, Glaudel and Sullivan with regard to the reasons why Mr. Borase was terminated.

2. During conversations with Messrs. Rayfield, Glaudel and Sullivan on the possibility of Mr. Borase bringing a discrimination claim against M/A COM.

3. During conversations with Messrs. Rayfield, Hale, Vanderslice, Glaudel and Sullivan about the proposed separation agreement with Mr. Borase.

4. During conversations with Mr. Rayfield on the question of Mr. Borase's entitlement to the restricted treasury stock.

5. During conversations with Mr. Morton about the dispute over the forfeiture of Mr. Borase's stock units.

This conclusion is fully applicable to Mr. Sullivan's discussions with Mr. Birchfield. As a consequence, it is ORDERED that Plaintiff Vijay Borase's Motion To Compel Deposition Testimony By J. Kermit Birchfield And James W. Sullivan (# 52) be, and the same hereby is, ALLOWED. The defendant M/A COM is ORDERED to produce Messrs. Birchfield and Sullivan for further deposition testimony and is PROHIBITED from instructing the witnesses not to answer questions relative to the above-listed areas.